Eastern District of Kentucky
FILED
JUL 0 2 2014
AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

MCFARLAND DEWEY
   SECURITIES CO., LLC,

   Plaintiff,

V.

AMERICAN METALS
   INDUSTRIES, INC., et al.,

   Defendants.

CIVIL ACTION NO. 5:13-44-KKC

**OPINION AND ORDER**

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Plaintiff's ("McFarland's") motion for summary judgment. For the reasons stated below, the motion will be granted.

**I.**    **BACKGROUND**

McFarland claims it is entitled to judgment in the amount of $340,000.00, plus interest, pursuant to several contracts it executed with American Metals Industries, Inc. ("AMI") in 2004 and for which it has not been paid. AMI does not dispute execution of the agreements by George F. Hofmeister as President of AMI, nor the principal amount due. The dispute is whether any of the other named defendants in this action are jointly liable to McFarland.

The facts in the present case, as evidenced by the written contracts and the declaration of Alan McFarland are as follows. On May 26, 2004, AMI retained McFarland as its financial adviser to introduce it to a number of potential investors for purposes of raising funds for Bridge Financing and Permanent Equity Financing for acquisition of three businesses. DE 24-3. As compensation, AMI agreed to pay McFarland 10 percent of the Bridge Financing and at varying rates for the Permanent Financing. *Id.* at p. 2. The agreement was signed by McFarland and George Hofmeister as President of AMI. *Id.* at 3.

On July 26, 2004, AMI retained McFarland as its financial advisor in connection with raising approximately $4 million in Bridge Financing, an additional $3 million in subordinate debt, and raising up to $50 million of Permanent Equity Financing. AMI agreed to pay McFarland 10 percent of the gross proceeds for the Bridge Financing, 5 percent of the gross proceeds for the additional Bridge Financing, and at varying rates for the Permanent Financing. DE 24-4. Again, the agreement was signed by representatives of AMI and McFarland. *Id.* at 3.

On August 2, 2004, AMI retained McFarland as its financial advisor to assist with the sale of three wholly-owned subsidiaries. As compensation for these services, McFarland was to be paid at the time of closing a flat fee of $100,000 for AMI-Manchester and a fee of 3 percent of the "enterprise value" received for the other two subsidiaries. DE 24-5. This agreement was likewise signed by both parties. *Id.* at 3. At the time of all three of these agreements, AMI was wholly owned by the George S. Hofmeister Family Trust ("HFT ").

McFarland performed the required services for AMI in 2004 and obtained financing from Airlie Opportunity Fund ("Airlie"). AMI requested that McFarland defer its compensation under the fee agreements until such time as the Airlie loans were repaid. McFarland agreed to defer payment of the fees but requested additional security for its fees. The HFT agreed to allow its assets to serve as security for payment of McFarland's fees. This agreement, made in 2004, was memorialized in a December 31, 2006 letter signed by the Trustee of the HFT. DE 24-2 at ¶¶ 9, 11, 12. In that letter, Douglas Holmes as Trustee of the HFT acknowledged that $7 million was raised by McFarland from Airlie and that McFarland agreed to defer receiving its fee until the principal of the loans was repaid to Airlie. DE 24-6. The letter agreement memorialized that the HFT pledged additional, "non-AMI," assets as security and reconfirmed that the HFT recognized its obligation to pay McFarland the remaining fees upon any debt repayment to Airlie. This letter was signed by McFarland and the HFT Trustee. *Id.*

On April 12, 2007, another letter agreement was signed by McFarland and George Hofmeister as Trustee of the Hofmeister Children's' Trusts ("CTs"). DE 24-7. This agreement

2

acknowledges that AMI "is now owned by the Hofmeister Children Family Trust." It notes that the HFT provided security for the loans to AMI by providing liens on certain non-AMI assets held by the HFT. It states that a $50,000 payment to McFarland was due in December 2006 and has not been paid. It confirms that the CTs recognize their obligation to pay or cause to be paid to McFarland the delayed placement fees owed upon any debt repayment. *Id.*

The Defendants do not dispute these facts, but instead argue that only AMI can be held liable as its corporate veil has not been pierced. McFarland's argument regarding liability of other defendants is based in part on the decision of Senior Judge Karl S. Forester in *Limbright v. Hofmeister*, No. 5:09-cv-107, 2011 WL 5523713 (E.D. Ky. November 14, 2011) ("*Limbright*"), which is incorporated by reference herein. In that case, Judge Forester concluded that George and Kay Hofmeister were the alter egos of the HFT and the CTs, and the CTs were the alter egos of the HFT. *Id.* at *4-7. Additionally, there were numerous transfers among the trusts and to individual defendants, which were held to be fraudulent transfers made to hinder, delay or defraud creditors. *Id.* at *8-9.

Defendants concede that McFarland is entitled to judgment against AMI. DE 28 at 2. They contend, however, that the HFT and the CTs were not parties to the original agreements, that Hofmeister was acting only in his official capacity as President of AMI, that the doctrine of Offensive Collateral Estoppel has no application to this case, that AMI's corporate veil has not been pierced, that the agreements of the HFT and CTs to pay the sums due to McFarland are not supported by consideration, and that the federal statutory interest rate would apply to any prejudgment interest. DE 28.

II. ANALYSIS

A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

3

matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In other words, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343.

### B. Applicable Law

Jurisdiction in this Court is based on diversity of citizenship. DE 14 at ¶ 11. In diversity actions, "Kentucky substantive law applies. Procedurally, federal standards for summary judgment govern." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 442 (6th Cir. 2009) (citations omitted). "In diversity cases in this Circuit, federal law controls postjudgment interest, but state law governs awards of prejudgment interest." *Estate of Riddle ex rel. Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005). Defendants' argument that federal law should control prejudgment interest is not supported by applicable law.

### C. AMI's Liability

Defendants concede the liability of AMI to McFarland. DE 28 at 1-2. Accordingly, summary judgment will be granted against AMI.

4

### D. Offensive Collateral Estoppel

McFarland relies on the doctrine of offensive collateral estoppel to impose liability on the HFT, the CTs, and George Hofmeister. The Defendants argue the doctrine has no application because AMI was not a party to the *Limbright* litigation, nor was AMI's corporate veil pierced. However, it is not AMI that McFarland is seeking to hold liable through offensive collateral estoppel. AMI admits its liability as a party to the contract with McFarland.

The "offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 4 (1979). Trial courts are given "broad discretion to determine when it should be applied." *Id.* at 652. The requirements of offensive collateral estoppel are: (1) a final decision on the merits; (2) identity of issues; (3) issues actually litigated and determined; (4) a necessary issue; (5) a prior losing litigant; and (6) a full and fair opportunity to litigate." *May v. Oldfield*, 698 F. Supp. 124, (E.D. Ky. 1988).

*Limbright* is unquestionably a final decision on the merits, which was affirmed on appeal. *Limbright v. Hofmeister*, 515 F.Appx. 397 (6th Cir. 2013). The issues in *Limbright* and here are the same – whether George Hofmeister, the HFT and the CTs are alter egos of each other such that they lose their separate identity. *Limbright* held that George Hofmeister was the alter ego of HFT and the CTs and that the CTs were the alter egos of HFT. *Limbright*, 2011 WL 5523713 at *3-*8. It further held that there were fraudulent transfers among Hofmeister, the Children, and the various trusts to avoid payment of creditors. *Id.* at *8-*11. These issues were actually litigated and determined based upon extensive discovery and ten years of litigation in various courts as the Limbrights sought to collect their 2002 judgment. Litigation of the issues was necessary to reach assets that could be used to satisfy the 2002 judgment. The court found that HFT pledged its assets to satisfy a settlement agreement with Limbright and then promptly

5

moved those assets, including AMI, to the Children and the CTs, leaving HFT insolvent. *Id.* at *4-*5, *9. The date of the transfer of HFT's assets to the Children, December 31, 2006, is the same date that HFT memorialized its pledge of its assets to secure the obligation to pay McFarland. DE 24-6. Thus, both Limbright and McFarland were promised certain assets to secure their debts, but those assets were immediately whisked away by Hofmeister.

Hofmeister, HFT and the CTs lost on those issues in the *Limbright* case after a hard-fought battle most recently spanning more than three years in this court. The amount in issue, $1.2 million, and attorney's fees of $0.5 million were not small or nominal. Hofmeister was fully engaged in the litigation as evidenced by the record and by the fact that he appealed the judgment and the award of fees, both of which were affirmed. Hofmeister could not and does not claim that he was denied a full and fair opportunity to litigate. None of the factors that may limit application of offensive collateral estoppel are present here. *May*, 698 F. Supp. at 126. See also, *United States v. Sandoz Pharmaceuticals Corp.*, 894 F.2d 825, 828 (6th Cir. 1990) (small or nominal damages and inability to engage in full scale discovery or call witnesses). Accordingly, the doctrine of offensive collateral estopped will be applied in this case, and summary judgment will be granted to McFarland.

### E.   The Letter Agreements with HFT and CTs

Defendants do not dispute the letters in which HFT, initially, and then the CTs acknowledged their liability for McFarland's fees. Instead, they argue that the agreements were made two years after the fees were earned and "fail for lack of any consideration by these parties to assume the obligations of AMI." DE 28 at 6.

McFarland's Declaration states that in 2004, AMI asked McFarland to defer payment of its fees until AMI repaid its loans from Airlie. Before agreeing to the deferred payment, McFarland requested additional security, and the HFT agreed to provide that security. This agreement was memorialized in writing December 31, 2006, but that letter states that deferral was a condition of making the debt investment in 2004. DE 24-2 at ¶¶ 9, 11, 12; DE 24-6. Also

6

on December 31, 2006, HFT transferred its assets, including AMI, to the Children, who promptly placed them in the CTs. *Id.* at ¶¶ 15; *Limbright*, 2011 WL 5523713 at *4. To obtain continued deferral of McFarland payments then due, the CTs, along with HFT and AMI, provided confirmation to McFarland that they were obligated to pay or cause to be paid the delayed fees. This agreement was memorialized by letter dated April 12, 2007. DE 24-7.

McFarland's agreement to defer payment was conditioned on promises of additional security from HFT and the CTs. AMI, a wholly owned subsidiary of HFT in 2004, benefited in that it was able to retain and use funds that otherwise would have been due to McFarland. Likewise, HFT had the use of these additional funds in the interim. The *Limbright* court found that funds from AMI bank accounts "were used for [Hofmeister's] personal living expenses and other family expenses." *Limbright*, at 4. Accordingly, George Hofmeister benefited, as well. When AMI became a wholly-owned asset of the CTs, payment to McFarland was again deferred in exchange for security from the CTs. Hofmeister, AMI and the CTs benefited by having cash available that otherwise would have been due to McFarland.

Kentucky has long recognized that "forbearance to sue is a valid consideration to support a promise." *Cooke v. Louisville Trust Co.*, 380 S.W.2d 255, 257 (Ky. 1964). In *Cooke*, a loan became due, but Cooke could not repay it at that time. He offered the lender a note and mortgage on his residence in exchange for additional time to pay. The court held that the forbearance of the lender to demand payment of the note, which Cooke guaranteed, "was sufficient consideration to support the note and mortgage in question." *Id.* Similarly, in *Alvey v. Union Investment, Inc.*, 697 S.W.2d 145 (Ky. 1985), there was a default by the debtor and forbearance by the lender in exchange for an agreement to make additional payments. Again, the forbearance to sue was valid consideration to support the promise.

In the present case, McFarland agreed in 2004 to defer its payment in exchange for additional security from HFT. When the assets securing its payment were transferred to the

7

CTs and a partial payment due of $50,000 had not been paid, McFarland demanded security from the CTs. In each case, McFarland's forbearance to sue was sufficient consideration.

Defendants further claim that the agreements with HFT and the CTs are void for failure to comply with KRS 371.065. That statute provides in part: "No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates." While the present guarantees were not written on the instruments being guaranteed, they did "expressly refer to" the debt being guaranteed. The 2006 letter references the $4 million in capital raised in April 2004, the additional $3 million raised in August 2004, the percentage fees due to McFarland, the request for deferral of payment to McFarland, the requirement for additional security, and the fees already paid. DE 24-6. The 2007 letter repeats this same information, along with the fact that AMI was now owned by the CTs. DE 24-7.

*Wheeler & Clevenger Oil Co., Inc. v. Washburn*, 127 S.W.3d 609, 615 (Ky. 2004) said that KRS 371.065 "is a consumer-protection provision designed to protect the guarantor by reducing the risk of a guarantor agreeing to guarantee an unknown obligation." In *Banterra Bank v. Hendrick*, No. 5:09cv12, 2011 WL 832455 at *9 (W.D. Ky. March 3, 2011), the court held that "taking the circumstances surrounding the guaranty as a whole, Osborne was fully aware of the amount he was guarantying, and therefore also fulfills the underlying policy concerns of KRS § 371.065 – that a guarantor make an informed decision when signing a guaranty." In the present case, the Trustees of the HFT and the CTs had express reference to the obligation to be guaranteed and made an informed decision to provide the guaranty in exchange for the benefit of deferred payments to McFarland. The requirements of KRS 371.065 and its underlying policy were fulfilled. Accordingly, McFarland is entitled to summary judgment against the HFT and the CTs under this legal theory as well.

## III. CONCLUSION

**IT IS ORDERED** that:

1. Plaintiff's motion for summary judgment [DE 24] is **GRANTED** as to Defendants AMI, George Hofmeister, the Hofmeister Family Trust, and the Children's Trusts; and

2. Judgment shall be entered contemporaneously with this Opinion and Order.

This July 2, 2014.



Signed By:
*Karen K. Caldwell*
United States District Judge